1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WINEPRESS PUBLISHING d/b/a
PLEASANT WORD,

          Plaintiff,

    v.

MARK LEVINE,

          Defendant.

CASE NO. C09-593RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on Defendant Mark Levine's motion for summary judgment.  Dkt. # 8.  Mr. Levine requested oral argument; Plaintiff WinePress Publishing, which does business as "Pleasant Word" did not.  The court finds this motion suitable for disposition based solely on the parties' briefing and supporting evidence.  For the reasons stated below, the court GRANTS Mr. Levine's motion, dismisses this action, and directs the clerk to enter judgment for Mr. Levine.

## II.  BACKGROUND

Mr. Levine is the author of "The Fine Print Of Self-Publishing," which is subtitled "The Contracts & Services of 45 Self-Publishing Companies – Analyzed, Ranked & Exposed" (hereinafter "Fine Print").  WinePress Publishing, which does business as Pleasant Word, is one of the 45 self-publishing companies rated in the book.  Pleasant Word contends that Fine Print does not merely analyze, rank, or expose:  it also defames.

ORDER – 1

1    Although Fine Print discusses each self-publisher it rates in some detail, the

2    discussion culminates in one of four labels: "Outstanding," "Pretty Good," "Just OK,"

3    and "Avoid." Fine Print at 46.[1] Pleasant Word received an "Avoid" label.

4        Fine Print's discussion of Pleasant Word includes a link to Pleasant Word's

5    website, a description of the genre of books it publishes and the format in which it

6    publishes, a description of Pleasant Word's four principal publishing packages (ranging

7    from the "White Ribbon Package" to the "Blue Ribbon Package"), commentary on

8    several other aspects of Pleasant Word's fees and services, and an overview of Pleasant

9    Word's standard publishing contract. Fine Print at 265-71.

10        In the final section of its discussion, Fine Print summarizes its reasons for giving

11   Pleasant Word an "Avoid" ranking. It notes Pleasant Word's identification as a Christian

12   publishing company, including Pleasant Word's statements on its website that "Pleasant

13   Word is a Christian company in every sense of the word," that "[e]very employee of

14   Pleasant Word is a committed Christian, so you can be sure we will serve you both

15   professionally and spiritually," and that "[a]s Christians and professionals, we have a

16   responsibility to be honest and realistic." Fine Print at 271-72. The final section refers to

17   its earlier discussion of Pleasant Word's pricing policies, which use its "Yellow Ribbon"

18   package as an example. Fine Print at 269-70. Fine Print observes that it would cost an

19   author $7.56 for each copy of a 200-page paperback book from Pleasant Word, and that

20   the actual cost of printing such a book is $3.90. Fine Print at 269. It thus deduces that

21   Pleasant Word nets $3.66 from such a sale, which is "nearly a 100% markup!"[2] *Id.* He

22   compares Pleasant Word's $3.66 from each such sale to the $0.53 that an author would

23   net from the sale of such a book on Amazon.com, concluding as follows: "That's a puny

24   royalty, considering Pleasant Word is making $3.66 (the printing markup) on each sale,

25   ─────────────
     [1] Excerpts from Fine Print are included in Mr. Levine's declaration (Dkt. # 9) at exhibits one
26   through three. The court cites Fine Print solely by its page numbering as published.

27   [2] Pleasant Word's $3.66 markup over its $3.90 actual printing cost is a 93.8% markup, but
     Pleasant Word does not quibble over the difference between 93.8% and 100%.

28   ORDER – 2

which is more than seven times what the author makes!" *Id.* Fine Print explains that its objection is not to the markup per se, but rather to the fact that Pleasant Word does not disclose the markup. Fine Print at 270 (explaining that a "100% markup" is acceptable "as long as the publisher discloses it and you can live with it").

Fine Print's discussion of Pleasant Word contains assertions of dishonesty. It contends that "[t]here are plenty of honest Christian publishers. Find one." Fine Print at 273. It states that "Pleasant Word is a publisher to avoid" because it is "less than forthright about the real printing costs, while advertising how honest and Christian it is . . . ." *Id.* It argues that when a "publisher chooses to make religion a central focus of its service," the publisher "has a duty to be over-the-top honest." Fine Print at 272-73.

Assertions like the ones in the previous paragraph are "demonstrably false" in Pleasant Word's view, as is the "overall claim and influence [sic] by Mr. Levine that WinePress/Pleasant Word is 'dishonest' and 'unChristian.'" Compl. (Dkt. # 1) ¶ 4.4. Pleasant Word has accordingly sued Mr. Levine for defamation, for intentional interference with a business expectancy, and for placing it in a false light.

The court now turns to Mr. Levine's motion for summary judgment against each of Pleasant Word's claims.

### III.  ANALYSIS

On a motion for summary judgment, the court cannot resolve factual disputes, but must instead draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its

ORDER – 3

1  claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558

2  (9th Cir. 1991). The court defers to neither party in answering legal questions. *See*

3  *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

4  **A.    Defamation**

5         No one disputes that Washington law applies here, under which a defamation

6  claim requires the plaintiff to prove a false, unprivileged communication that is made

7  with the requisite degree of fault and damages the plaintiff. *Mohr v. Grant*, 108 P.3d

8  768, 773 (Wash. 2005). Some of these elements have different requirements depending

9  on whether the alleged defamatory statement targets a public figure or describes matters

10  of public concern. *See*, *e.g.*, *Alpine Indus. Computers, Inc. v. Cowles Publ'g Co.*, 57 P.3d

11  1178, 1188 (Wash. Ct. App. 2002) (discussing changes in defamation standards and

12  burdens of proof for public-figure plaintiffs); *Philadelphia Newspapers, Inc. v. Hepps*,

13  475 U.S. 767, 768 (1986) (noting that "two forces" are critical in determining the extent

14  to which the First Amendment reshapes state defamation law: "The first is whether the

15  plaintiff is a public official or figure, or is instead a private figure. The second is whether

16  the speech at issue is of public concern."). In this case, however, the court need consider

17  only the most basic element of a defamation claim:  the publication of a false statement.

18         In considering the falsity of the statements Pleasant Word challenges, the court

19  will in some cases determine whether any reasonable jury could find the statement false;

20  and in other cases determine whether the statement is neither true nor false. Expressions

21  of opinion are neither true nor false, and thus cannot serve as the basis for a defamation

22  action. *Robel v. Roundup Corp.*, 59 P.3d 611, 621 (Wash. 2002). The court alone must

23  determine whether "allegedly defamatory words were intended as a statement of fact or

24  an expression of opinion . . . ." *Id.* at 622. To distinguish between fact and opinion, the

25  court must consider the totality of the circumstances and the context in which a

26  defamatory statement is made, including "at least" the following factors: "(1) the medium

27  and context in which the statement was published, (2) the audience to whom it was

28  ORDER – 4

1  published, and (3) whether the statement implies undisclosed facts." *Id.* at 622 (quoting

2  *Dunlap v. Wayne*, 716 P.2d 842, 848 (Wash. 1986)).

3       The court begins its application of these principles by reviewing the context in

4  which a reader would find Fine Print's allegedly defamatory statements about Pleasant

5  Word. Most of those statements stem from Fine Print's dissatisfaction with Pleasant

6  Word's disclosure of printing costs. Chapter Three of Fine Print describes the "Nine

7  Qualities of a Good Self-Publishing Company." Fine Print at 10. Several of those

8  qualities relate to royalties and printing costs. *Id.* Mr. Levine asserts that "most self-

9  publishing companies use the same printer to print their books," and thus a standard

10  "200-page book costs a publisher $3.90." *Id.* Mr. Levine therefore concludes as follows:

11       A 200-page paperback costs the publisher approximately $3.90. You've
read this next line a dozen different ways in this book, but it's important, so
12  read it again: Any publisher that tells you the per book production costs are
higher is gouging you and making a tidy profit on printing.

13

14  Fine Print at 20.

15       Pleasant Word does not challenge the assertion that its printing costs are about

16  $3.90, but it is this assertion that underlies virtually all of Fine Print's assessments of

17  self-publishing fees. Fine Print at 14 ("Knowing [the $3.90 per book price] might be the

18  most important thing in my book."). Mr. Levine asserts that "[a]nything more than a

19  15% markup on printing is simply not acceptable, unless you know what it is for and

20  don't mind paying more than you should." Fine Print at 21. Mr. Levine often

21  characterizes anything less than full disclosure of actual printing costs as a "lie" or a

22  similarly disreputable practice. *E.g.*, Fine Print at 14 (explaining that knowing per-book

23  costs "will help you see . . . which publishers *lie* to you about their production costs")

24  (emphasis added); Fine Print at 14 ("Net sales figures can be manipulated by, for

25  example, hiding inflated printing costs within the actual printing cost"); Fine Print at 19

26  (characterizing any per-book cost that does not state the actual production cost to be a

27  "random, inflated printing cost"); Fine Print at 20 (characterizing justifications for

28  ORDER – 5

printing markups as "doublespeak made to confuse the author"). Mr. Levine also observes that many self-publishing companies set a high retail price for books to permit them to extract exorbitant fees. Fine Print at 17. Mr. Levine believes this to be a "huge problem in self-publishing" because it makes self-published books more expensive than traditionally published books by established authors. *Id.*

In this context, it is not difficult to understand why Pleasant Word fares poorly in Fine Print. Although Pleasant Word discloses the retail price and "package premium" that applies to each book it prints, those disclosures are not to Mr. Levine's liking. Pleasant Word suggests a retail price of $17.99 for a paperback book, far above the prices for paperback books from established authors. Fraser Decl. (Dkt. # 12), Ex. 1; Fine Print at 17 (describing costs of books from established authors); Fine Print at 268 (disapproving of Pleasant Word's $17.99 retail price, concluding that "[a] book that size should retail between $12.00 and $14.95. The high retail price means that the printing costs are greatly inflated."). Pleasant Word does not challenge these factual assertions regarding its retail price.

Pleasant Word undisputedly does not provide complete disclosure of the costs it charges to authors. Its website advertises a "straightforward package premium instead of artificially inflating the printing costs," and promises authors that they "receive 100% of the net profit on **all** sales of your book." Fraser Decl. (Dkt. # 12), Ex. 1. The underlined terms are hyperlinks to definitions of the terms. Pleasant Word's "package premium" hyperlink leads an author to the following explanation:

> Package Premium
>
> This means that Pleasant Word regains a percentage of each sale.
>
> **Why do we do this?** Pleasant Word provides continued customer service on your distribution and sales. And, as part of The WinePress Group, we actively engage in advertising and marketing initiatives that promote our brand, draw customers to our bookstore, and provide "across the board" benefits to all of our authors.

ORDER – 6

**The package premium helps us to help our authors sell books.**

> With other publishers, this is often hidden in the "printing cost" and authors receive far less benefits in return, so don't be fooled.

Fraser Decl., Ex. 2 (emphases in original). The "net profit" hyperlink leads to this explanation:

> Net Profit
>
> The **net profit** is the actual sale price minus the publishing costs.
>
> It is calculated by taking the price your book is sold for, and then deducting the printing cost and the package premium. . . .

Fraser Decl., Ex. 3 (emphasis in original). Notably, the Pleasant Word website nowhere reveals the actual printing cost for a book. It defines "net profit" in two inconsistent ways. First, it explains that "net profit" is the "actual sale price minus the printing cost," but if this is the case, then Pleasant Word's promise that 100% of the "net profit" goes to the author is false. Pleasant Word does not merely charge authors the actual printing cost, but an additional markup as well. Pleasant Word's statement that the net profit is the price of the book minus "the printing cost and the package premium" is closer to accurate, but still not completely accurate, because in reality Pleasant Word incorporates the actual printing cost into the package premium, rather than separately identifying actual printing costs and the premium Pleasant Word charges. For this reason, Pleasant Word's disapproval of other publishers' practice of hiding the costs incorporated in its package premium in the "printing cost" is questionable. Apparently what Pleasant Word calls a "package premium," other publishers call "printing costs." In either case, an author is not told what the actual printing costs are.

These facts are the foundation of the statements Pleasant Word challenges as defamatory. Fine Print asserts that Pleasant Word is "less than forthright about the real printing costs." Fine Print at 273. Mr. Levine is correct, because Pleasant Word does not

ORDER – 7

1    disclose its "real printing costs." Pleasant Word claims that this statement is defamatory.

2    It is not defamatory because it is undisputedly true. No jury could find otherwise.

3        Mr. Levine asserts that Pleasant Word "leads authors to believe that its printing

4    costs are 100% higher than they actually are." Fine Print at 272. This statement arises

5    from the book's unchallenged factual finding that Pleasant Word's "package premium"

6    of $7.56 is $3.66 more than Pleasant Word's actual printing costs. *See supra* n.2 &

7    accompanying text. Pleasant Word apparently protests that it does not "lead authors to

8    believe" otherwise, but the undisputed facts show that Pleasant Word does not disclose its

9    actual printing costs, and its statements about the difference between its package

10   premium and actual printing costs are confusing at best. Given that Mr. Levine fully

11   discloses the facts that underlie his view that Pleasant Word's pricing description is

12   misleading, his assertion is either factually accurate or within the scope of non-actionable

13   opinion. *Dunlap*, 716 P.2d at 849 ("Arguments for actionability disappear when the

14   audience members know the facts underlying an assertion and can judge the truthfulness

15   of the allegedly defamatory statement themselves.").

16       Pleasant Word also contends that the following statement is defamatory: "In the

17   example discussed in this review, the author makes $.53 per sale while Pleasant Word

18   makes $3.66 through the extra padding it adds to the printing costs." Fine Print at 272.

19   Pleasant Word does not challenge Mr. Levine's numbers, it challenges his use of the term

20   "extra padding." This is baffling. It is undisputed that Pleasant Word adds $3.66 to

21   actual printing costs to arrive at its "package premium." Mr. Levine's choice of the term

22   "extra padding" to describe this package is not false, and thus cannot be defamatory.

23       The remainder of the statements that Pleasant Word challenges either directly state

24   or imply that Pleasant Word is dishonest or unethical.[3] The court concludes that each of

25   _____

26   [3] Pleasant Word contends in its complaint that Mr. Levine defamatorily implies that it is
     "unChristian." Compl. ¶ 4.4. Pleasant Word does not repeat this assertion in its opposition to
     the summary judgment motion. Indeed, it concedes that "Mr. Levine's view of a Christian
27   publisher's duty is his own opinion." Pltf.'s Opp'n at 4.

28   ORDER – 8

these statements merely expresses Mr. Levine's opinion.  In reaching that conclusion, the court first notes that an assertion that someone is "dishonest" is not necessarily an expression of fact.  Case law establishes that such labels may be mere opinion.  *E.g.*, *Robel*, 59 P.3d at 622 (noting that the words "snitch," "squealer," and "liar" can be expressions of opinion); *Benjamin v. Cowles Publ'g Co.*, 684 P.2d 739, 742-43 (Wash. Ct. App. 1984) (implied statement that store owner was "stealing" found to be opinion); *Lewis v. Time Inc.*, 710 F.2d 549, 555 (9th Cir. 1983) (statement that attorney was a "shady practitioner" found to be opinion).

In context, Mr. Levine's assertions of dishonesty[4] are not merely opinions, they are opinions whose bases he fully discloses.  Pleasant Word does not challenge the factual assertion that, in Mr. Levine's example, it pockets $3.66 while the author makes only $0.53.  Readers of Fine Print will not be surprised that this inflames Mr. Levine.  Earlier in the book, he explains that a hypothetical company making only 2.5 times as much as the author per book is, in his view, cause for "anger" on the author's part.  Fine Print at 18.  A payment of less than 50% of the publisher's per-book net is a "sign to pick another publisher."  Fine Print at 19.  That a royalty payment that is approximately 15% of Pleasant Word's $3.66 per-book fee would lead to a poor rating is no surprise.  That Mr. Levine characterizes these practices as dishonest or unethical is also no surprise, as he views anything less than full disclosure of actual printing costs to be dishonest.  One can debate, of course, whether Mr. Levine's focus on the disclosure of actual printing costs is the best measure of a publisher's ethics or honesty, but that debate is one to be held outside of a defamation lawsuit.  *See Lewis*, 710 F.2d at 555 ("If an expression of opinion follows from non-defamatory facts that are either stated or assumed, the reader is likely to take the opinion for what it is.  Indeed, the reader is free to form another,

---

[4] The court has quoted many of the Fine Print passages that Pleasant Word alleges either assert or imply that it is dishonest or unethical, but has not quoted all of them.  *See* Pltf.'s Opp'n at 4-5.  The court has considered each statement that Pleasant Word challenges.  Although the court does not necessarily agree that they assert or imply dishonesty or unethical conduct, the court finds that none of them expresses actionable fact rather than opinion.

ORDER – 9

perhaps contradictory opinion from the same facts."). Having disclosed the facts underlying his opinions, Mr. Levine is free to characterize those facts as he wishes. *Robel*, 59 P.3d at 622. Another author might have characterized Pleasant Word's marketing differently, but that is no basis for a defamation claim.

Pleasant Word mistakenly believes that Fine Print's many exhortations to readers to follow and trust Mr. Levine's advice transforms his opinions about ethics and honesty into fact. *See* Pltf.'s Opp'n at 4. Any reviewer urges his or her readers to trust his or her opinion. A reviewer is unlikely to prosper by asserting "this is merely my opinion, please disregard it." Yet publications of ratings and reviews are ubiquitous, despite the many people, products, and services that are the targets of unfavorable reviews. Absent evidence of false statements, the disappointed target has no recourse in law. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974) ("However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.").

Finally, the court finds no merit in Pleasant Word's assertion that another Christian publisher, Xulon Press, received an "Outstanding" ranking despite charging higher royalties. Plaintiff made this argument in attempting to provide evidence of Mr. Levine's alleged malice, an issue that the court need not reach in light of Pleasant Word's failure to provide evidence of a false statement. Nonetheless, the court notes that even if it assumes that Fine Print's rating of Pleasant Word is somehow unfair or inconsistent, Mr. Levine has no obligation to be either fair or consistent. His sole obligation is to state facts accurately, and there is no allegation that he has not accurately summarized the facts underlying the rating he gave to Xulon. A defamation claim is a means to remedy harms caused by falsehood, not a means to petition for different treatment from an author. *See, e.g.*, *Mohr*, 108 P.3d at 776 (finding plaintiff's claim that different approach "would have led to a more balanced report" to be irrelevant where "broadcast did not create a false impression and thus was not defamatory").

ORDER – 10

**B.  Intentional Interference with a Business Expectancy**

The court's disposition of Pleasant Word's defamation claim is determinative of its remaining claims as well.  Pleasant Word's claim for intentional interference with a business expectancy requires it to prove the following elements: (1) the existence of a valid contractual relationship or business expectancy; (2) that Mr. Levine had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that Mr. Levine interfered for an improper purpose or used improper means; and (5) resultant damage.  *Leingang v. Pierce County Medical Bureau*, 930 P.2d 288, 300 (Wash. 1997).  Here, Pleasant Word has not articulated any improper purpose underlying Mr. Levine's review of Pleasant Word.  Its inability to point to defamatory statements makes it unable prove that Mr. Levine used improper means.  For at least those reasons, Plaintiff's claim for interference with a business expectancy fails as a matter of law.

**C.  False Light**

False light, a species of the tort of invasion of privacy, requires publicity of a matter that places a plaintiff in a false light that "would be highly offensive to a reasonable person" where the defendant "knew of or recklessly disregarded the falsity of the publication and the false light in which the other would be placed." *Eastwood v. Cascade Broad. Co.*, 722 P.2d 1295, 1297 (Wash. 1986).  In this case, Pleasant Word's inability to prove a false publication is dispositive of its false light claim.  *See Harris v. City of Seattle*, 315 F. Supp. 2d 1112, 1123 (W.D. Wash. 2004) ("To allege a false light claim, the plaintiff must show that the material contained false statements of fact.").

ORDER – 11

## IV. CONCLUSION

For the reasons stated above, the court GRANTS Mr. Levine's summary judgment motion (Dkt. # 8) and dismisses Plaintiff's claims with prejudice.[5] The court directs the clerk to enter judgment for Mr. Levine.

DATED this 9th day of November, 2009.



_____
The Honorable Richard A. Jones
United States District Judge

---

[5] The court's disposition makes it unnecessary to reach Mr. Levine's motion to strike the declaration of Malcolm Fraser, a Pleasant Word executive.

ORDER – 12